IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MASIMO CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. _____ |
| | ) | |
| PHILIPS ELECTRONICS NORTH | ) | **JURY TRIAL DEMANDED** |
| AMERICA CORPORATION and PHILIPS | ) | |
| MEDIZIN SYSTEME BÖBLINGEN GMBH, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Masimo Corporation ("Masimo") hereby complains of Defendants Philips Electronics North American Corporation and Philips Medizin Systeme Böblingen GmbH and alleges as follows:

## PARTIES

1.      Plaintiff Masimo is a corporation incorporated under the laws of Delaware and has its principal place of business at 52 Discovery, Irvine, California 92618.

2.      Masimo is a global medical technology company that develops and manufactures innovative noninvasive patient monitoring technologies. Masimo's award-winning innovations over more than twenty years have led to a portfolio of products that have been demonstrated clinically superior in more than 100 independent and objective studies. In addition to a complete array of Masimo-branded monitors, Masimo technology is integrated into more than 90 multi-parameter monitors and more than 40 monitoring brands throughout the world. Masimo's pioneering Signal Extraction Technology, Masimo SET® ("Masimo SET"), acquires and detects signals generated by red and infrared light-emitting diodes to provide oxygen saturation and pulse rate values from such signals. Masimo SET is covered by numerous patents worldwide.

3.     Upon information and belief, Defendant Philips Electronics North America Corporation ("Philips") is a Delaware corporation having its principal place of business at 3000 Minuteman Rd., Andover, Massachusetts 01810.

4.     Upon information and belief, Defendant Philips Medizin Systeme BÖBLINGEN GmbH ("Philips Böblingen") is a corporation organized and existing under the laws of Germany having its principal place of business at Hewlett-Packard-Strasse 2, 71034 Böblingen, Germany.

## JURISDICTION AND VENUE

5.     Masimo realleges and reincorporates by reference the allegations set forth in Paragraphs 1-4 of this Complaint.

6.     Masimo asserts claims for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 100 et seq., more particularly, 35 U.S.C. § 271.  This Court has subject matter jurisdiction of these claims under 28 U.S.C. §§ 1331 and 1338(a).

7.     Masimo also asserts federal antitrust counterclaims against Philips that arise under 15 U.S.C. §§ 1, 2, 15, and 26.  This Court is vested with original and exclusive subject-matter jurisdiction over these claims under 15 U.S.C. § 15, and it otherwise has subject-matter jurisdiction over them under 28 U.S.C. § 1331

8.     Defendant Philips resides in Delaware and is subject to personal jurisdiction in Delaware, and has committed the acts complained of in this Judicial District.

9.     Defendant Philips Böblingen conducts substantial and continuous business in the United States, and is subject to personal jurisdiction in Delaware.  Philips Böblingen has, within this Judicial District, engaged in at least the selling and/or importing of the accused products herein.  In addition, Philips Böblingen has induced infringement of the asserted patents and contributed to the infringement of the asserted patents by resellers and/or infringing users located in this Judicial District.  Philips Böblingen has also consented to jurisdiction in this Court in another litigation.

2

10.     Venue is proper in this Judicial District under 28 U.S.C. § 1391(b), (c), (d), and 1400(b).

## THE PATENTS-IN-SUIT

11.     Masimo is the owner by assignment of U.S. Patent No. 8,532,727 entitled "Dual-Mode Pulse Oximeter" ("the '727 patent") which the United States Patent and Trademark Office lawfully and duly issued on September 10, 2013.  A true and correct copy of the '727 patent is attached hereto as Exhibit 1.

12.     Masimo is the owner by assignment of U.S. Patent No. 8,180,420 entitled "Signal Processing Apparatus and Method" ("the '420 patent") which the United States Patent and Trademark Office lawfully and duly issued on May 15, 2012.  A true and correct copy of the '420 patent is attached hereto as Exhibit 2.

13.     Masimo is the owner by assignment of U.S. Patent No. 8,888,708 entitled "Signal Processing Apparatus and Method" ("the '708 patent") which the United States Patent and Trademark Office lawfully and duly issued on November 18, 2014.  A true and correct copy of the '708 patent is attached hereto as Exhibit 3.

## PHILIPS' AND PHILIPS BÖBLINGEN'S INFRINGING ACTIVITIES

14.     Upon information and belief, Philips and Philips Böblingen have made, used, offered to sell, and/or sold within the United States, and/or have imported into the United States, products including at least pulse oximeters incorporating a technology called "Fourier Artifact Suppression Technology" ("FAST-SpO2") such as the IntelliVue line of patient monitors, including, without limitation, the MP20/30, MP40/50, and MP60/70/80/90 monitors, MX500/700/800 monitors, and MMS X2 transport monitors (collectively, "FAST-SpO2 Products").

15.     Upon further information and belief, Philips and Philips Böblingen have made, used, offered to sell, and/or sold within the United States, and/or have imported into the United States,

products including at least the MMS X2 transport monitors combined with the IntelliVue line of patient monitors, including at least the MP20/30, MP40/50, and MP60/70/80/90 monitors and MX500/700/800 monitors (collectively, "the Combined Monitors").

## ALLEGATIONS COMMON TO ANTITRUST COUNTERCLAIMS

16.     The present antitrust challenge arises from the sale of multi-parameter patient monitors ("MPPMs") and the separate parameter systems that run on MPPMs. MPPMs are indispensable medical devices commonly used in modern medical practice. They are used to monitor the health and progress of hospital patients by measuring and displaying the status of the patients' vital signs and other physiological conditions.

17.     An MPPM is generally a medical monitoring computer system with a display that is equipped with various separate parameter systems (the "parameter systems" or "systems"), each of which is typically made by a different parameter-systems supplier (a "parameter systems supplier" or "supplier"). A parameter system, in turn, consists of a circuit board, integrated circuit designs, or a module that is installed in the MPPM, as well as various accessories used in those systems, such as cables and sensors. Suppliers of parameter systems provide circuit boards, integrated circuit designs, and/or modules to the MPPM manufacturers, which incorporate them into completed MPPMs or place the boards in parameter modules for insertion into or connection with MPPMs. MPPM manufacturers sell the MPPMs and/or parameter modules to hospitals and other health-care providers.

18.     To operate properly, each parameter system requires the use of accessory products (mostly cables and sensors) that are designed specifically to operate with the board, integrated circuit design, or module, which together with the accessory products form a parameter system. After a hospital purchases an MPPM, it continues to buy necessary accessory products for use with each parameter system. The hospital buys these accessories directly from the parameter-systems

supplier or sometimes through the MPPM manufacturer.  For most manufacturer's MPPMs, the hospital can also convert the MPPM to exchange one parameter system for another.

19.     Each MPPM thus serves as a platform that supports the various parameter systems from the parameter-systems suppliers.  Each parameter-systems supplier competes to persuade hospitals to purchase an MPPM with its parameter system or to switch to its parameter system even if the hospital's MPPMs were originally shipped with a rival system.  One such system is a pulse-oximetry parameter system that provides parameters for a patient's blood oxygen saturation and pulse rate.

20.     Philips, a global firm, is the world's leading manufacturer of MPPMs.  Philips' MPPMs are used by well over 50% of hospitals in the United States.  Philips is also a supplier of certain kinds of parameter systems, which it includes in its own MPPMs.  Philips thus places other suppliers' parameter systems, as well as its own parameter systems, into its MPPMs.  Philips claims, therefore, to offer its MPPMs to hospitals with various options, including different suppliers' systems and Philips' own parameter systems.

21.     Parameter-systems suppliers have long regarded Philips as the "kingmaker," because Philips dictates which suppliers will have access to the vast number of hospitals that have chosen Philips as their MPPM provider.  In the United States, Philips is the dominant provider of MPPMs to hospitals.  Philips has acquired, maintained, and continually enlarged this dominant position by various anticompetitive practices, which specifically include anticompetitive conduct directed against parameter systems suppliers.

22.     In the United States, hospitals prefer to standardize their MPPM brands/platforms throughout the hospital and, in many cases, throughout a larger health care system that consist of many participating hospitals.  MPPMs are very expensive capital equipment and are used in many care areas throughout the hospital.   It requires enormous capital for a hospital or health system to

change from one brand of MPPMs to another.  Thus, once a hospital has selected an MPPM brand, that hospital cannot easily change MPPM brands.

23.    Accordingly, if Philips excludes a parameter supplier's system as an option, that supplier is foreclosed from making sales to hospitals that use Philips' MPPMs.  In those circumstances, hospitals cannot use the parameter supplier's systems without first switching MPPM brands, which is generally not a practical option.  Because Philips is the dominant supplier of MPPMs in United States hospitals, if it excludes a supplier's parameter system from its MPPMs, the supplier likely cannot remain in business.

24.    Using anticompetitive practices, Philips has acquired, maintained, and enlarged monopoly power in the high-acuity and central-station MPPM markets described below.  Philips has also used anticompetitive practices in an attempt to obtain monopoly power in the mid-acuity MPPM market fully described below.  Philips has also used anticompetitive practices to monopolize, or attempted to monopolize, sales in an antitrust aftermarket for pulse-oximetry parameter systems that run on Philips' MPPMs.  Philips created that aftermarket by exploiting its market power in the MPPM markets and subjecting its customers to aftermarket abuses.  Philips has also coerced others to enter into commercial arrangements by which it has impermissibly restrained trade in the identified MPPM markets and aftermarket.  By these anticompetitive practices, Philips has directly harmed parameter-systems suppliers, rival sellers of MPPMs, and purchasers of MPPMs.

25.    Philips' dominance of these MPPM markets is of increasing concern.  Recent third-party independent market reports, such as iData's industry-leading reports, reveal that prices have been steadily increasing in the above three markets, as Philips' market share grows.  Moreover, Philips has successfully undermined competitive conditions in the affected markets.  Its parameter-systems suppliers are beholden to Philips and have no choice but to accept Philips' anticompetitive

impositions.  Further, Philips has suppressed superior technologies in third-party rival parameter systems where such technologies threaten Philips' sales of its own parameter systems.  In addition, Philips has imposed supracompetitive pricing and other onerous terms on its increasingly captive hospital customers, which must pass along the higher costs and render inferior medical care to their patients.

26.     Philips has restrained and monopolized trade in the affected markets and aftermarket by the following anticompetitive measures (among others), each of which has directly and significantly harmed competitive processes in the affected markets and, in so doing, harmed Masimo:

a.     Exploiting its market power and its parameter-systems suppliers' dependence on it as the "kingmaker," Philips has been able to secure its boards from dependent parameter-systems suppliers on conditions they would not accept absent Philips' market power.  By doing so, Philips has gained an insuperable advantage over rival MPPM manufacturers and ensured that its dominant position remains unassailable.

b.     Without justification, Philips has infringed Masimo's patents in order to offer its own proficient pulse-oximetry parameter system in its MPPMs without incurring the licensing fees or development costs that would otherwise be necessary to offer such a system.  By doing so, Philips has unreasonably raised its rivals' costs and improperly gained an insuperable competitive advantage over other sellers of MPPMs.  Philips' competitors lack this unfair advantage and have been obliged to offer lesser pulse-oximetry parameter systems or incur development or licensing costs that Philips was able to avoid.

c.     Philips has acquired other MPPM sellers in order to gain market power in the above MPPM markets.  After acquiring each seller, Philips integrates the seller's operations with its own, so that its other anticompetitive practices (alleged herein) are

employed by its enlarged business entity.   If it preserves the brand or autonomy of an acquired business operation, Philips nevertheless ensures that the acquired operation employs the same anticompetitive practices.

        d.     Without justification, Philips has marked up the selling prices of its MPPMs that contain third-party parameter systems that threaten its own parameters systems, doing so only to render rival parameter systems less attractive than its own to hospital purchasers.

        e.     Without justification, Philips has pro-actively suppressed superior features in its suppliers' parameter systems, doing so only to render rival parameter systems less attractive than its own to hospital purchasers.   This has artificially suppressed sales of third-party parameter systems so as to favor the sale of Philips' own systems.   This has also withheld critical life-saving technologies from patients in the most challenging conditions.

        f.     Unlike all other sellers of MPPMs, and without justification, Philips has refused to provide or allow "conversion kits" that permit hospitals easily to exchange one supplier's parameter system for another in their existing MPPMs.   This has unreasonably raised its rivals' costs, constrained the purchasing options available to hospitals and deprived hospital customers of competition among parameter-systems suppliers after they purchase MPPMs from Philips.

        g.     Philips has refused to place third-party parameter systems in certain key MPPM offerings in select departments, or to permit necessary technology links to rival parameter suppliers across the hospital or health system.   This prevents hospitals or hospital departments from standardizing on the use of rival parameter systems.   Because many hospitals and hospital departments prefer to standardize on a particular parameter system, this prevents hospitals from using rival systems at all.

h.      Abusing its market power in the MPPM markets, Philips has imposed long-term contracts and arrangements on its hospital customers that in practice operate as exclusive-dealer arrangements.  These agreements have the effect of obliging hospitals to purchase from Philips all or nearly all of their MPPM products, parameter systems, and other unrelated products, such as large imaging devices.  These agreements also require hospitals to purchase related services from Philips for long periods of time.  Pursuant to these agreements, Philips also places biomedical representatives at hospitals that wield significant influence and cause hospitals to favor Philips' products.  These exclusive-dealer arrangements have unreasonably increased the costs of Philips' rivals and impermissibly foreclosed competition for sales of MPPMs and parameter systems.

27.     Philips' anticompetitive abuses constitute offenses under Sections 1 and 2 of the Sherman Act.  Moreover, the anticompetitive character of these antitrust offenses has proximately caused significant, direct and ongoing antitrust injury to Masimo, as fully explained below.  Accordingly, Masimo asserts its present claims against Philips under Sections 1 and 2 of the Sherman Act.

**A.      Multiparameter Patient Monitors**

28.     MPPMs are medical devices that serve as platforms that host independent parameter systems.  MPPMs display simultaneous readings of a patient's vital sign and, optionally, other physiological measurements.  Each physiological measurement that is displayed is called a "parameter."  An MPPM generally includes a display (monitor) and various independent parameter systems, each of which contains circuitry and programming that works with related accessories to measure different parameters.

29.     Each parameter system may occupy its own "module" that is installed in a receptacle socket located on the MPPM.  Alternatively, multiple parameter systems may be grouped in a single

module that is then attached or connected to an MPPM. As another alternative, an MPPM may be an integrated monitor that contains the display and all parameter systems in a single integrated housing. Parameter-systems suppliers must adapt their systems to these different configurations to provide their systems to hospitals.

30.     MPPMs of all types offer simultaneous readings of several parameters, each of which is provided by a separate parameter system. MPPMs typically provide at least the following parameters, which are referred to as the patient's four primary vital signs: body temperature, blood pressure, pulse rate, and respiratory rate. MPPMs also provide arterial blood oxygen saturation, which has sometimes been called the "fifth primary vital sign." This fifth vital sign is measured by pulse-oximetry parameter systems.

31.     Certain MPPMs can also monitor additional parameters, including: electro-cardiograph readings (measurements of heart function); blood circulation; electromyogram readings (electrical measurements of muscle responsiveness); carbon dioxide levels; various respiratory functions (including the measurement of sleep apnea); blood glucose levels and other hemodynamic readings; inter-cranial pressure; electroencephalogram readings (measurements of electrical activity in the brain); other measurements of cerebral functions; childbirth monitoring; and other readings.

32.     As described above, most parameter systems that work with MPPMs require the use of connector cables and sensors to connect the board, integrated circuit design or module to the patients being monitored. Some systems are connected to patients with invasive tubes or catheters.

33.     There are four general categories of MPPMs: low-acuity MPPMs; mid-acuity MPPMs; high-acuity MPPMs; and central-station MPPMs.

34.     Low-acuity MPPMs are principally used to provide a patient's primary vital signs, including oxygen saturation. Low-acuity MPPMs are typically used in non-critical-care

circumstances such as hospital wards, urgent care clinics, other outpatient clinics, alternative care facilities, doctors' and dentists' offices, and other health-care facilities.

35.     Mid-acuity MPPMs are typically used to monitor a patient's primary vital signs, including oxygen saturation, as well as other indications specified by the health-care provider.  Mid-acuity MPPMs are often used in the emergency room, recovery areas, step-down units, outpatient surgery centers, and other alternative-care settings.

36.     High-acuity MPPMs are parameter systems for measuring a patient's primary vital signs, including oxygen saturation, and various other physiological parameters.  They are used to provide continuous monitoring of patients who suffer from potentially life-threatening medical conditions or in other life support situations, such as during surgery where the respiratory function is being provided by a respirator.  Typically, a high-acuity MPPM is used to provide continuous monitoring of the patient's primary vital signs plus additional vital signs and indications of physiological status specifically chosen by the health-care provider.  High-acuity MPPMs are commonly attached to patients undergoing surgery or being treated in intensive and critical care units.

37.     Central-station monitoring is performed by placing MPPM central-monitoring servers in a central location that communicate with individual MPPMs (of the same company/brand) located at the point of patient care by means of wireless technology or cable connections.  The MPPM centralized monitoring servers display the parameters of all patients monitored by the individual MPPMs of the same brand as the MPPM central servers.    Dedicated staff members observe these MPPM central server displays at the central location and report the findings for each patient under observation.  Central-station MPPMs are typically used to provide continuous monitoring of patients who require dedicated, continuous monitoring, including patients treated in intensive or critical care units.  The central monitoring servers are very expensive, and

since they are limited to monitoring the same brand of individual MPPMs, it is very costly to consider replacing individual MPPMs in a department that requires central-station monitoring.

38.     MPPMs are widely used to monitor the progress of patients who enter emergency rooms in critical condition, are under anesthesia, are being operated upon, are recovering from surgery, or are receiving treatment in intensive-care or critical-care units.   For many critical situations, modern health-care professionals regard appropriately configured MPPMs to be fundamentally necessary to perform their work and a precondition of the basic standard of care in modern medicine.   MPPMs are thus widely regarded as indispensable tools that provide necessary measurements to health-care providers.   No proficient or modern hospital in the United States foregoes the use of MPPMs.   All of them use MPPMs and use each kind of MPPM for its intended purposes.

39.     Each MPPM thus serves as an indispensable platform that supports the various parameter systems provided by parameter-systems suppliers.

**B.     The Relevant Markets**

40.     The United States is the effective area of competition (or relevant geographic market) for each of the product markets and aftermarkets at issue in the present case.

41.     There exists a relevant product market (or submarket) for high-acuity MPPMs.   The hospitals and other health-care professionals that purchase and use high-acuity MPPMs require these products for specified medical uses (briefly described above).   There is no reasonably interchangeable substitute product or service that can take their place, nor cross-elasticity of demand between this product and any other product or service.

42.     There exists a relevant product market (or submarket) for mid-acuity MPPMs. The hospitals and other health-care professionals who purchase and use mid-acuity MPPMs require these products for specified medical uses (briefly described above).   There is no reasonably

interchangeable substitute product or service that can take their place, nor cross-elasticity of demand between this product and any other product or service.

43.     There exists a relevant product market (or submarket) for central-station MPPMs. The hospitals and other health-care professionals who purchase and use central-station MPPMs require these products for specified medical uses (briefly described above).  There is no reasonably interchangeable substitute product or service that can take their place, nor cross-elasticity of demand between this product and any other product or service.

44.     Philips systematically abuses its market power in the MPPM markets and its presence in over 50% of hospitals to lock purchasers of its MPPMs into antitrust aftermarkets. Philips employs further anticompetitive practices in the aftermarkets to ensure purchasers will select Philips' parameter systems and forego purchasing third-party parameter systems.  One such antitrust aftermarket is the market for pulse-oximetry parameter systems that run on Philips' MPPMs.  There is no reasonable substitute for such pulse-oximetry parameter systems.  In this aftermarket, Philips has coerced its customers into purchasing its own pulse-oximetry parameter systems for use in Philips' MPPMs.  Philips has done so by abusing its market power in the MPPM markets and by various other commercial improprieties, as explained below, and not by voluntary contractual arrangements.

45.     By exploiting this market power, Philips coerces purchasers of its MPPMs to submit to restrictions whose purpose is to prevent rival systems suppliers from competing in the aftermarkets described above.   Philips fails to adequately disclose these restrictions, causing purchasers to submit to them because they have already acquired Philips' MPPMs, particularly its high-acuity, mid-acuity, and central-station MPPMs.  Moreover, Philips abuses its market power to oblige purchasers to assent to anticompetitive exclusive-dealing and exclusive-supplier contracts,

under which they are constrained to accept these anticompetitive restrictions. These purchasers would not assent to such restrictions in fully competitive MPPM markets.

46.     The above product markets and aftermarket are explicitly recognized as such by market participants, industry experts, and disinterested observers. Each of the above three kinds of MPPMs also has peculiar characteristics and uses, distinct prices, distinct demand curves (independent sensitivity to price changes), and distinct marketing approaches. Suppliers of parameter systems, integrators of these parameter systems, distributors, and customers regard each kind of MPPM as separately marketed, sold, and distributed for uses that no other product can fulfill. Moreover, parameter-systems suppliers compete with one another to make aftermarket parameter-systems sales to hospitals that use Philips' MPPMs, but are impeded in their efforts by Philips' anticompetitive practices.

### C.     Philips' Market Power

47.     Philips is the dominant seller of MPPMs in the United States and has acquired market power in the markets for high-acuity, mid-acuity, and central-station MPPMs sold in the United States. In these markets, Philips has substantial market shares and its market positions are protected by high barriers to expansion and to entry.

48.     In the market for high-acuity MPPMs sold in the United States, Philips makes over 50% of overall sales, its market share has been continually increasing, and its market position is protected by strong barriers to expansion and entry. Other sellers have significantly smaller market shares and cannot act as viable competitors that can expand output and impose discipline on Philips' commercial conduct. Likewise, no potential seller can enter the market to do so.

49.     In the market for central-station MPPMs sold in the United States, Philips makes over 50% of overall sales, its market share has been continually increasing, and its market position is protected by strong barriers to expansion and entry. Other sellers have significantly smaller

market shares and cannot act as viable competitors that can expand output and impose discipline on Philips' commercial conduct.  Likewise, no potential seller can enter the market to do so.

50.      In the market for mid-acuity MPPMs sold in the United States, Philips makes over 42% of overall sales, its market share has been continually increasing, and its market position is protected by strong barriers to expansion and entry.  Other sellers have significantly smaller market shares than Philips and cannot act as viable competitors that can expand output and impose discipline on Philips' commercial conduct.  Likewise, no potential seller can enter the market to do so.

51.      In the aftermarket for pulse-oximetry parameter systems that operate with Philips' MPPM platform, Philips has a dominant market share and its position is protected by strong barriers to expansion and entry, including the various anticompetitive practices identified below.  Owing to Philips' abuse of its market power in the MPPM markets and related aftermarket abuses, other sellers cannot act as viable competitors that can expand output and impose discipline on Philips' commercial conduct.  Likewise, no potential seller can enter this market to do so.

52.      Philips wields market power in these markets.  More specifically, in each of these markets, Philips faces no threat that any existing or potential competitor can readily deprive it of sales by expansion or entry if it imposes a statistically significant, non-transitory increase in its prices ("SSNIP"), or if it imposes other onerous commercial terms that its customers would not accept in competitive markets.

**D.      Philips' Anticompetitive Acts**

**1.      Philips' Anticompetitive Procurement Practices**

53.      Philips has employed anticompetitive procurement practices to perfect its acquisition and maintenance of market power in the above MPPM markets.

54.     Owing to its commanding market power in the MPPM markets, Philips has become the unquestioned "kingmaker" in these markets.  The parameter-systems suppliers' business survival and commercial success depend largely on whether Philips includes their parameter systems in its MPPMs.  Exploiting this circumstance, Philips has been able to secure its boards from dependent parameter-systems suppliers on conditions they would not accept absent Philips' market power.

55.     In this manner, Philips has gained an insuperable advantage over rival manufacturers of MPPMs, which cannot procure their inputs on the same conditions that Philips exacts from its captive suppliers.  Philips has deftly exploited this advantage to unreasonably raise its rivals' costs and ensure that its dominant position in the MPPM markets remains unassailable and self-reinforcing.

56.     Moreover, the above is direct evidence of Philips' market power in the above MPPM markets.

57.     Philips' actions constitute anticompetitive practices that it has employed to maintain monopoly power in two relevant markets (central-station and high-acuity MPPMs), and that it has employed in furtherance of its increasingly successful attempt to acquire monopoly power in a third relevant market (mid-acuity MPPMs).

### 2.     Philips' Patent Infringement

58.     Philips has engaged in systematic infringement of Masimo's patents to offer proficient pulse-oximetry parameter systems in its MPPMs without paying licensing fees to Masimo or paying the development fees that would otherwise be required to develop such a system.

59.     By using an infringing pulse-oximetry parameter system without bearing the full cost for it, Philips improperly gained an insuperable competitive advantage over other sellers of

MPPMs.  Philips' competitors lacked this unfair advantage and have been obliged to pay Masimo or another proficient supplier to license the use of a proficient pulse-oximetry parameter system.

60.    There is no conceivable justification for Philips' patent infringement.  By this practice, Philips has sought to unreasonably raise its rivals' costs and exclude rival sellers of MPPMs and rival suppliers of pulse-oximetry parameter systems while boosting its own sales of MPPMs and pulse-oximetry parameter systems, including accessory cables and sensors that form a part of these systems.  Philips has specifically employed this practice against Masimo's pulse-oximetry parameter systems to reinforce its dominance in the MPPM markets and the aftermarket for pulse-oximetry parameter systems used with Philips' MPPMs.

### 3.    Philips' Willful Acquisition of Rival MPPM Sellers

61.    With the intention of acquiring monopoly power in each of the above-three MPPM markets, Philips has acquired rival sellers of MPPMs, including: Witt Biomedical, Invivo, Respironics, and other formerly independent sellers of MPPMs.

62.    After each acquisition, Philips integrated the rival seller's operations into its own or had the new business unit adopt its standard practices, including its anticompetitive practices alleged in this complaint.

63.    These practices constitute a continuing harm and the anticompetitive effects of the acquisitions have continually persisted and worsened over time and remain ongoing. The anticompetitive consequences of Philips' other anticompetitive practices have been magnified by each acquisition and by all of them cumulatively.

### 4.    Philips' Suppression of Life-Saving Product Features

64.    Philips has abused its market power in the MPPM markets and its control of its MPPM platform to disable certain features otherwise readily available in its suppliers' parameter systems.  Philips does so to boost the sales of its own parameter systems, including the cables and

sensors that form a part of the parameter system.  Philips does so specifically to monopolize the above-pled aftermarket and restrain trade in that aftermarket.  Philips' customers do not know about this practice when they agree to purchase its MPPMs or, if they do know, submit to it only because of Philips' market power.

65.     For example, Philips intentionally downgrades Masimo's pulse-oximetry parameter systems so that Masimo's "Max Sensitivity" feature is not available to hospitals that purchase Philips MPPMs containing Masimo pulse-oximetry parameter systems.  Max Sensitivity is a "sensitivity mode" that provides increased sensitivity for patients with low perfusion.  This mode is recommended when a patient is known to have low perfusion or when a low perfusion message displays during pulse-oximetry monitoring.  This enhanced sensitivity can provide critical life-saving support for the most vulnerable patients in the most challenging conditions.

66.     Max Sensitivity is readily available as a feature in Masimo's parameter systems and in virtually all non-Philips MPPMs that offer Masimo technology.  Philips could easily activate it at negligible cost.  Acting with no conceivable pro-competitive justification, and despite frequent requests from physicians, clinicians, and hospitals, Philips refuses to activate this feature in its MPPMs, depriving many hospitals and patients of the chance to benefit from it.  Philips does so to favor its own pulse-oximetry parameter systems, which lack this feature.  By refusing to enable Max Sensitivity, Philips attempts to level the technological playing field between Masimo and Philips, which improperly deprives Masimo of the competitive advantage provided by Masimo's superior technology.  As a result, hospitals are induced to purchase Philips' own pulse-oximetry parameter systems rather than Masimo's systems.  This practice confers no conceivable benefit on the purchasers of Philips' MPPMs.  It deprives them of benefits without any offsetting justification.

67.     Philips also intentionally downgrades Masimo's pulse-oximetry parameter systems by refusing to activate a second feature offered by Masimo called "Signal IQ."  Signal IQ is an

indicator of the confidence in the measurement, which can be useful when a patient experiences motion or low perfusion.  Signal IQ offers an indication that rises and falls with the level of confidence for the pulse oximetry measurement.  As with Max Sensitivity, Philips has refused to activate this technology in Masimo's pulse-oximetry parameter systems used in Philips' MPPMs, even though it could do so at negligible cost.  Philips improperly deprives its customers of this improvement to suppress competition between its own pulse-oximetry parameter systems and Masimo's superior systems.  Philips' suppression of this feature in Masimo's systems is anticompetitive, has no conceivable procompetitive justification, and offers no benefit to its customers.  Rather, this practice deprives the customer of benefits without any offsetting justification.

### 5.      Philips' Anticompetitive Suppression of System Conversions

68.      To further monopolize and restrain trade in the aftermarkets for parameter systems that operate with its MPPMs, Philips also prevents hospitals from converting its MPPMs to new parameter systems, contrary to the standard practice followed by other manufacturers of MPPMs. When a hospital customer seeks to switch from one pulse-oximetry parameter system to another, the hospital typically need not purchase new MPPMs.   This is because Masimo has collaborated with other MPPM providers to create upgrade kits, which the customer can purchase at minimal cost. The upgrade kits consist of a few replacement parts that can be easily installed in the MPPM (e.g., a replacement pulse oximetry board and a replacement connector for the MPPM's connector panel). Masimo's pulse-oximetry upgrade kits make it economically feasible for the customer to upgrade the performance of existing MPPMs, facilitating better care at the lowest possible cost.

69.      Unlike other MPPM manufacturers, and without any conceivable procompetitive justification, Philips refuses to allow the use of such technology upgrade kits.  Instead, if a customer wishes to switch from one parameter system to another (e.g., exchanging Philips' pulse-oximetry

parameter system for Masimo's pulse-oximetry parameter system), Philips requires the customer to replace its very expensive MPPM products. This imposes a prohibitive and gratuitous expense on customers. New MPPM products can cost many thousands of dollars more than the price of a simple upgrade kit.

70.     Philips' refusal to permit the use of upgrade kits in its MPPMs unreasonably raises its rivals' costs and dramatically increases the prices that customers must pay to convert and upgrade to competing parameter systems, including superior parameter systems. This undermines competition in the aftermarket by burdening customers' ability to switch to competing systems after they have purchased Philips' MPPMs. Philips' customers do not knowingly or willing assent to this restriction, but find themselves captive to it and/or constrained to accept it despite the burdens and sometimes inferior patient care it imposes on them. They submit to the imposition only because of Philips' abuse of its market power in the MPPM markets and Philips' related anticompetitive practices. Philips specifically enforces this practice in the antitrust aftermarket for pulse-oximetry parameter systems that operate with its MPPMs.

71.     Philips' practice directly harms suppliers, including Masimo. Masimo sometimes pays for the cost of a conversion to convince a customer to switch to Masimo system. In exchange, the hospital receives the conversion and then purchases Masimo's superior sensors and cables so that the Masimo system will operate properly. Masimo cannot efficiently employ this approach with Philips' MPPMs, which are used at more than 50% of the hospitals in the United States, because Philips refuses to permit the use of conversion kits. Instead, for the upgrade and conversion of Philips' MPPMs, Masimo must purchase a new MPPM or module from Philips and pass along a substantial part of this gratuitous cost to the hospital customers. As a result, Philips unreasonably raises Masimo's costs, and it is often not economically feasible for hospital customers to switch to Masimo's superior parameter systems when the customers are using Philips' MPPMs.

72.     There is no conceivable pro-competitive justification for Philips' refusal to allow upgrade kits.  Philips' competitors in the MPPM markets readily offer such kits.  Philips' policy on upgrade kits confers no benefit on its customers.  Upgrade kits are easy to produce and install.  They are commonly available from other manufacturers of MPPMs.  Philips' refusal to sell or allow them is a naked restraint, whose only purpose is to frustrate and prevent aftermarket competition from rival parameter-systems suppliers whose systems compete against its own.  Philips has specifically employed this practice against Masimo's pulse-oximetry parameter systems to reinforce its dominance in the antitrust aftermarket for pulse-oximetry parameter systems used in Philips' MPPMs.

**6.     Philips' Anticompetitive Mark-Ups**

73.     Without any procompetitive justification, Philips marks up the cost of its MPPMs that operate with rival parameter systems (e.g., Masimo's pulse-oximetry parameter system), so that these MPPMs cost more than MPPMs that operate with Philips' own parameter systems (e.g., Philips' infringing pulse-oximetry parameter system).

74.     Philips marks up rival parameter systems that operate with its MPPMs to supracompetitive rates.  It does so to make the rival parameter systems less attractive to its customers, to unreasonably raise the costs of its rivals, like Masimo, that purchase such systems, and to exact supracompetitive prices where the customers decide anyway to purchase a rival parameter system to operate with Philips' MPPMs.

75.     By this practice, Philips has harmed competitive processes in the MPPM markets by imposing inferior products on captive customers subject to its market power.  Philips has also suppressed competition in the antitrust aftermarkets that it has created by its misuse of market power in the MPPM markets.

76.     This practice allows Philips to boost the sales of its own parameter systems and thereby maintain and reinforce its domination and control of the identified aftermarket.  There is no conceivable justification for this practice, which confers no benefit on Philips' customers.  Philips has specifically employed this practice against Masimo's pulse-oximetry parameter systems to unreasonably raise Masimo's costs and to reinforce Philips' dominance in the antitrust aftermarket for pulse-oximetry parameter systems used in Philips' MPPMs.

### 7.      Philips' Product Blocking

77.     Philips also refuses to make rival supplier's systems widely available in the full line of its MPPM products to frustrate and impede hospitals from standardizing their operations by using a particular supplier's system in some or all of their MPPMs.

78.     Standardization of technology and/or the associated accessories is often critically important to most hospitals and is often a decisive consideration for them when deciding which suppliers' systems to have placed in their MPPMs.  Philips refuses to provide rival systems in certain of its most popular MPPMs in order to prevent its hospital customers from standardizing the use of rival parameter systems that could otherwise run on its MPPMS.

79.     By this practice, Philips has harmed competitive processes in the MPPM markets by imposing inferior parameter systems products on captive customers subject to its market power. Philips has also suppressed competition in the antitrust aftermarkets that it has created by its misuse of market power in the MPPM markets.

80.     This practice allows Philips to boost sales of its own parameter systems that operate with its MPPMs and suppress sales of rival systems for original placement or post-shipment conversions. There is no conceivable justification for this practice, which confers no benefit on Philips' customers.  As the result of its market power, Philips is also able to engage in a host of other unfair practices against system suppliers that no system supplier would accept as to any other

MPPM manufacturer.  For example, Philips offers Masimo's parameter systems at large mark-ups not justified by any costs, thereby intentionally inhibiting acquisition by the customers.

81.     Philips has specifically employed this practice against Masimo's pulse-oximetry parameter systems to monopolize and restrain trade in the antitrust aftermarket for pulse-oximetry parameter systems that operate with Philips' MPPMs.

### 8.     Philips' Long-Term Exclusive Agreements

82.     Exploiting its market power in the MPPM markets, Philips has obliged its hospital customers to accept de facto long-term exclusive-dealing agreements and exclusive-provider service contracts that in practice substantially foreclose competition for the sale of MPPMs, parameter systems that operate with its MPPMs, and aftermarket sales of parameter systems that operate with Philips' MPPMs.

83.     These agreements have the practical effect of requiring the hospital customers to purchase most or all of their MPPMs from Philips and to purchase those MPPMs with parameter systems supplied by Philips.  Under many of these agreements, Philips becomes the exclusive dealer and/or service-provider for as long as fifteen years.  These deals are highly valuable and lock up sales worth as much as $500 million per deal.

84.     Under these agreements, Philips often places its own "biomedical engineers" and service representatives within hospitals, where they purport to guide and educate the hospitals about evolving medical technologies and medical devices.  Thus situated, Philips' employees wield tremendous influence over the hospitals' understanding of these matters and the hospitals' ongoing purchasing decisions.  This tactic has impeded the hospitals' efforts to understand and keep abreast of engineering developments in medical technology.  By accepting Philips' biomedical engineer/service personnel, the hospitals have in effect outsourced product review of medical

devices to Philips' (interested) representatives.  Philips has exploited this circumstance and caused hospitals to favor its MPPMs and its own parameter systems that run on its MPPMs.

85.     These exclusive-dealer agreements have unreasonably raised the costs of Philips' rivals, including Masimo, and effectually locked out and substantially foreclosed smaller competitors in the affected markets and aftermarkets.  Potential competitors have been effectually foreclosed from access to a sufficient base of potential customers so that it is no longer possible to make enough sales to attain the economies of scale required to effectively compete against Philips.

86.     Philips' exclusive-dealing arrangements have thus harmed competition in the affected MPPM markets and antitrust aftermarkets, boosted its own sales of MPPMs and parameter systems, and thereby maintained and reinforced its domination and control of the MPPM markets and antitrust aftermarket placed in issue in this case.

### 9.     Philips' Lack of Business Justification

87.     Philips lacks any legitimate business justification for its above-identified anticompetitive practices, each of which is illicit, and all of which Philips has cumulatively used to monopolize and restrain trade in the above-pled MPPM markets and antitrust aftermarkets.  Even if Philips had legitimate business purposes for any of its above practices, it could readily accomplish those purposes by less restrictive practices.

### E.     Harm To Competition and Consumers

88.     Philips' anticompetitive acquisition and maintenance of monopoly power and its restraints of trade have directly resulted in demonstrable harm to competitive processes in the affected markets and antitrust aftermarkets.

### 1.     Supracompetitive Prices

89.     Philips' behavior has directly harmed competition.  Average sales prices for MPPMs have increased to supracompetitive levels in each of the three MPPM markets in which Philips has

established market power, but have decreased in the one MPPM market it does not dominate. According to iData, which publishes leading industry reports relied on by most market participants (including Philips), average sales prices ("ASPs") have steadily increased in the markets for high-acuity MPPMs, mid-acuity MPPMs, and central-station MPPMs sold in the United States. In contrast, Philips holds a smaller market share in the market for low-acuity MPPMs sold in the United States. In that market, prices have continually fallen.

90.    Falling prices in the low-acuity MPPM market are not an anomaly. In most medical device markets, prices have been continually falling because of improving technology, economies of scale, and improved production methods. Three notable exceptions are the billion-dollar markets for MPPMs that Philips dominates and controls.

## 2.    Impoverishment of Product Quality

91.    Philips' actions have impeded suppliers' ability to turn profits and invest in product improvements. In addition, Philips has suppressed beneficial features in suppliers' systems that improve patient care whenever it fears that these systems might pose unwelcome competition to Philips' own parameter systems in its MPPMs. As a consequence, hospitals and patients have been deprived of the benefit of the competing technologies, superior parameter systems, and robust competition among parameter-systems suppliers.

## 3.    Pervasive Suppression of Competitive Conditions

92.    Rival sellers of MPPMs have been unable to obtain their core inputs (the parameter systems) on the same conditions that Philips obtains them. In addition, these rivals have been harmed by Philips' deliberate patent infringement because Philips did not have to pay to license or acquire proficient pulse-oximetry parameter systems or incur the costs that would otherwise be necessary to develop its own system. The rival sellers of MPPMs have been further harmed by Philips' imposition of exclusive-dealing contracts and its manipulation of switching costs. Each of

these practices have unreasonably raised the costs of Philips' rivals and substantially foreclosed competition in the identified markets.

93.     By the above-pled practices, and because of their harm to competitive processes in the MPPM markets, Philips has preserved and enlarged its dominant positions in the affected MPPM markets.  This, in turn, has facilitated Philips' placement of hospital customers into antitrust aftermarkets in which Philips has imposed supracompetitive prices, inferior products, and other onerous commercial terms without losing substantial sales.

**F.     Masimo's Antitrust Injury**

94.     Masimo has suffered losses as a direct consequence of the anticompetitive aspects of Philips' conduct.  The full extent of Masimo's losses will be demonstrated at a later stage of these proceedings.

95.     Among other things, Masimo has lost profits from the sale of its pulse oximetry boards to Philips.  Masimo has also lost profits from the sales it would have been made if other MPPM manufacturers using Masimo's parameter systems (which do not infringe or suppress Masimo's technology) could effectively compete and capture a larger share of the identified markets.  Masimo has also lost sales of pulse-oximetry parameter systems that Philips' customers otherwise would have chosen, including lost sales of cables and sensors that complete the parameter system.

96.     Philips' anticompetitive suppression of Masimo's technology in Philips' MPPMs has also harmed Masimo's brand and goodwill.

97.     Further, because of Philips' refusal to provide conversion kits, Masimo has become a direct purchaser of Philips' MPPMs and modules and has borne antitrust losses on these purchases because of Philips' supracompetitive prices.

98.     Philips' anticompetitive abuses have thus caused Masimo to suffer unreasonably increased costs and large, ongoing losses of profits and opportunities as well as significant erosion of its goodwill and brand.  The injuries Masimo suffered were inextricably intertwined with the injuries Philips sought to inflict on the identified markets and market participants.  Philips' conduct toward Masimo was the very means by which Philips sought to achieve its illegal ends.  All of Masimo's above-described losses are antitrust injuries – i.e., losses proximately caused by the anticompetitive aspects and character of Philips' conduct.

### G.     Masimo's Antitrust Standing

99.     Masimo has antitrust standing to bring the present claims because it has been directly harmed by the challenged practices in the affected markets and aftermarket.  Masimo is a supplier of pulse-oximetry parameter systems in the above MPPM markets and has lost profits on its sales to Philips in these markets.  Masimo has also lost sales to Philips because of Philips' use of its own infringing system.  Masimo has also lost sales to rival MPPM sellers because their own sales have been diminished by Philips' anticompetitive practices.  These lost sales in turn mean that Masimo has lost sales and profits on the system accessories that hospitals periodically purchase for use in these systems.

100.     Moreover, Masimo engages in ongoing, extensive efforts to convince hospitals to purchase MPPMs equipped with its pulse-oximetry parameter systems and convert their existing MPPMs to Masimo's systems.  Masimo also sells a patient monitoring and connectivity platform with expandable measurement capability called Root®.  In addition, because of Philips' anticompetitive refusal to allow conversions, Masimo is also a purchaser of Philips' MPPMs and pays supracompetitive prices for products that it never should have been obliged to purchase at all.  Owing to Philips' above anticompetitive practices, Masimo has suffered unreasonably increased costs and direct, large, and ongoing losses.

101.    Masimo is uniquely situated to complain of the above-pled antitrust wrongs and to demonstrate their occurrence and anticompetitive effects.  Masimo has unique insight into these practices and evidence to prove their occurrence and their injurious effects on competitive processes in the affected markets.  Masimo also has evidence to prove Philips' predatory intent.  Perhaps more than any other market participant, Masimo has the evidence, understanding, direct knowledge, financial interest, and resources to state, develop, and present these antitrust claims.

102.    Masimo's losses directly flow from the anticompetitive conduct it now challenges. There is no risk of an improper allocation of these losses among various claimants, nor any risk that Philips will be ordered to pay the same damages twice if it is ordered to compensate Masimo for Masimo's antitrust injuries.  Masimo's losses are not speculative, remote, or tenuously connected to Philips' antitrust misconduct.  In addition, Philips' anticompetitive misconduct has directly and significantly harmed Masimo in the manner pled above and in the very markets in which Philips has committed its anticompetitive acts.  Masimo therefore has antitrust standing to assert its present antitrust challenge against Philips.

## FIRST CLAIM FOR RELIEF
### Infringement Of The '727 Patent

103.    Masimo realleges and reincorporates the allegations set forth in Paragraphs 1 through 102 of this Complaint.

104.    Upon information and belief, Philips' and Philips Böblingen's Combined Monitors infringe at least one claim of the '727 patent under 35 U.S.C. § 271(a), (b), or (c).

105.    Upon information and belief, Philips and Philips Böblingen are aware of the '727 patent.

106.    Upon information and belief, Philips and Philips Böblingen have actively induced others to infringe the '727 patent.  Philips' and Philips Böblingen's acts constitute infringement of the '727 patent in violation of 35 U.S.C. § 271(b).

107.     Upon information and belief, Philips and Philips Böblingen act in concert to provide the Combined Monitors to customers in the United States.

108.     Upon information and belief, Philips and Philips Böblingen actively induce health-care service providers to directly infringe the asserted claims of the '727 patent.  By way of example only, upon information and belief, Philips and Philips Böblingen actively induce direct infringement of the '727 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use, refurbishing, and/or servicing of the Combined Monitors.

109.     Upon information and belief, Philips and Philips Böblingen have monitored Masimo's patents, and in particular patents related to U.S. Patent Nos. 5,632,272; 6,699,194; 5,632,272; 6,002,952; 6,157,850; 6,263,222; 6,334,065; 6,650,917; 6,699,194; 6,745,060; 6,770,028; 7,215,984; 7,489,958; 7,499,741; 7,509,154; and 7,530,949 which were previously asserted against Philips and Philips Böblingen.  Upon further information and belief, through the knowledge of the '727 patent gained by monitoring Masimo's patents, Philips and Philips Böblingen knew or should have known that these activities would cause direct infringement.

110.     Upon information and belief, Philips' and Philips Böblingen's acts constitute contributory infringement of the '727 patent in violation of 35 U.S.C. § 271(c).  Upon information and belief, Philips and Philips Böblingen contributorily infringe because, among other things, Philips and Philips Böblingen offer to sell and/or sell within the United States, and/or import into the United States, components of the Combined Monitors that constitute material parts of the invention of the asserted claims of the '727 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are known by Philips and Philips Böblingen to be especially made or especially adapted for use in an infringement of the '727 patent.

111.     Upon further information and belief, such components are used by Philips and Philips Böblingen in connection with the refurbishing, servicing and/or use of infringing Combined

Monitors in the United States, thereby constituting direct infringement of the asserted claims of the '727 patent.

112.    Upon information and belief, Philips' and Philips Böblingen's infringement of the '727 patent has been, and continues to be, willful, deliberate, and intentional by continuing their acts of infringement after becoming aware of the '727 patent and its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

113.    As a consequence of Philips' and Philips Böblingen's patent infringement of the '727 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

114.    Upon information and belief, unless enjoined, Philips, Philips Böblingen, and/or others acting on behalf of Philips and Philips Böblingen, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

**SECOND CLAIM FOR RELIEF**
**Infringement Of The '420 Patent**

115.    Masimo realleges and reincorporates the allegations set forth in Paragraphs 1 through 114 of this Complaint.

116.    Upon information and belief, Philips' and Philips Böblingen's FAST-SpO2 Products infringe at least one claim of the '420 patent under 35 U.S.C. § 271(a), (b), or (c).

117.    Upon information and belief, Philips and Philips Böblingen are aware of the '420 patent.

118.    Upon information and belief, Philips and Philips Böblingen have actively induced others to infringe the '420 patent.  Philips' and Philips Böblingen's acts constitute infringement of the '420 patent in violation of 35 U.S.C. § 271(b).

119.    Upon information and belief, Philips and Philips Böblingen act in concert to provide FAST-SpO2 Products to customers in the United States.

120.    Upon information and belief, Philips and Philips Böblingen actively induce health-care service providers to directly infringe the asserted claims of the '420 patent.  By way of example only, upon information and belief, Philips and Philips Böblingen actively induce direct infringement of the '420 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use, refurbishing, and/or servicing of FAST-SpO2 Products.

121.    Upon information and belief, Philips and Philips Böblingen have monitored Masimo's patents, and in particular patents related to U.S. Patent Nos. 5,632,272; 6,699,194; 5,632,272; 6,002,952; 6,157,850; 6,263,222; 6,334,065; 6,650,917; 6,699,194; 6,745,060; 6,770,028; 7,215,984; 7,489,958; 7,499,741; 7,509,154; and 7,530,949 which were previously asserted against Philips and Philips Böblingen.  Upon further information and belief, through the knowledge of the '420 patent gained by monitoring Masimo's patents, Philips and Philips Böblingen knew or should have known that these activities would cause direct infringement.

122.    Upon information and belief, Philips' and Philips Böblingen's acts constitute contributory infringement of the '420 patent in violation of 35 U.S.C. § 271(c).  Upon information and belief, Philips and Philips Böblingen contributorily infringe because, among other things, Philips and Philips Böblingen offer to sell and/or sell within the United States, and/or import into the United States, components of FAST-SpO2 Products that constitute material parts of the invention of the asserted claims of the '420 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are known by Philips and Philips Böblingen to be especially made or especially adapted for use in an infringement of the '420 patent.

123.    Upon further information and belief, such components are used by Philips and Philips Böblingen in connection with the refurbishing, servicing and/or use of infringing FAST-SpO2 Products in the United States, thereby constituting direct infringement of the asserted claims of the '420 patent.

124.     Upon information and belief, Philips' and Philips Böblingen's infringement of the '420 patent has been, and continues to be, willful, deliberate, and intentional by continuing their acts of infringement after becoming aware of the '420 patent and its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

125.     As a consequence of Philips' and Philips Böblingen's patent infringement of the '420 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

126.     Upon information and belief, unless enjoined, Philips, Philips Böblingen, and/or others acting on behalf of Philips and Philips Böblingen, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

### THIRD CLAIM FOR RELIEF
### Infringement Of The '708 Patent

127.     Masimo realleges and reincorporates the allegations set forth in Paragraphs 1 through 126 of this Complaint.

128.     Upon information and belief, Philips' and Philips Böblingen's FAST-SpO2 Products infringe at least one claim of the '708 patent under 35 U.S.C. § 271(a), (b), or (c).

129.     Upon information and belief, Philips and Philips Böblingen are aware of the '708 patent.

130.     Upon information and belief, Philips and Philips Böblingen have actively induced others to infringe the '708 patent. Philips' and Philips Böblingen's acts constitute infringement of the '708 patent in violation of 35 U.S.C. § 271(b).

131.     Upon information and belief, Philips and Philips Böblingen act in concert to provide FAST-SpO2 Products to customers in the United States.

132.     Upon information and belief, Philips and Philips Böblingen actively induce health-care service providers to directly infringe the asserted claims of the '708 patent. By way of example

only, upon information and belief, Philips and Philips Böblingen actively induce direct infringement of the '708 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use, refurbishing, and/or servicing of FAST-SpO2 Products.

133.   Upon information and belief, Philips and Philips Böblingen have monitored Masimo's patents, and in particular patents related to U.S. Patent Nos. 5,632,272; 6,699,194; 5,632,272; 6,002,952; 6,157,850; 6,263,222; 6,334,065; 6,650,917; 6,699,194; 6,745,060; 6,770,028; 7,215,984; 7,489,958; 7,499,741; 7,509,154; and 7,530,949 which were previously asserted against Philips and Philips Böblingen.  Upon further information and belief, through the knowledge of the '708 patent gained by monitoring Masimo's patents, Philips and Philips Böblingen knew or should have known that these activities would cause direct infringement.

134.   Upon information and belief, Philips' and Philips Böblingen's acts constitute contributory infringement of the '708 patent in violation of 35 U.S.C. § 271(c).  Upon information and belief, Philips and Philips Böblingen contributorily infringe because, among other things, Philips and Philips Böblingen offer to sell and/or sell within the United States, and/or import into the United States, components of FAST-SpO2 Products that constitute material parts of the invention of the asserted claims of the '708 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are known by Philips and Philips Böblingen to be especially made or especially adapted for use in an infringement of the '708 patent.

135.   Upon further information and belief, such components are used by Philips and Philips Böblingen in connection with the refurbishing, servicing and/or use of infringing FAST-SpO2 Products in the United States, thereby constituting direct infringement of the asserted claims of the '708 patent.

136.   Upon information and belief, Philips' and Philips Böblingen's infringement of the '708 patent has been, and continues to be, willful, deliberate, and intentional by continuing their acts

of infringement after becoming aware of the '708 patent and its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

137.    As a consequence of Philips' and Philips Böblingen's patent infringement of the '708 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

138.    Upon information and belief, unless enjoined, Philips, Philips Böblingen, and/or others acting on behalf of Philips and Philips Böblingen, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

## FOURTH CLAIM FOR RELIEF
### Unlawful Monopolization In Violation Of Section 2 Of The Sherman Act (15 U.S.C. § 2)

139.    Masimo incorporates herein and realleges the allegations set forth in Paragraphs 1-138 of this Complaint.

140.    By means of the above-pled anticompetitive conduct, Philips has unlawfully acquired, maintained, and enlarged a monopoly position in the market for the sale of high-acuity MPPMs in the United States.  By so doing, Philips has committed the offense of monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

141.    By means of the above-pled anticompetitive conduct, Philips has unlawfully acquired, maintained, and enlarged a monopoly position in the market for the sale of central-station MPPMs in the United States.  By so doing, Philips has committed the offense of monopolization in violation of Section 2 of the Sherman Act.

142.    By means of the above-pled anticompetitive conduct, Philips has unlawfully acquired, maintained and enlarged a monopoly position in the antitrust aftermarket for pulse-oximetry parameter systems that run on Philips' MPPMs.  By so doing, Philips has committed the offense of monopolization in violation of Section 2 of the Sherman Act.

143.    Masimo has antitrust standing and has suffered losses in proximate consequence of the anticompetitive character of Philips' monopolization of these markets (i.e., Masimo has suffered compensable antitrust injuries).  These losses remain ongoing, since Philips persists in the above-pled anticompetitive conduct.

### FIFTH CLAIM FOR RELIEF
**Unlawful Attempted Monopolization In Violation Of Section 2
Of The Sherman Act (15 U.S.C. § 2)**

144.    Masimo incorporates herein and realleges the allegations set forth in Paragraphs 1-143 of this Complaint.

145.    By means of the above-pled anticompetitive conduct, and with a specific intent to monopolize commerce, Philips has attempted to acquire a monopoly position in the market for the sale of high-acuity MPPMs in the United States.  By so doing, Philips has committed the offense of attempted monopolization in violation of Section 2 of the Sherman Act.

146.    By means of the above-pled anticompetitive conduct, and with a specific intent to monopolize commerce, Philips has attempted to acquire a monopoly position in the market for the sale of mid-acuity MPPMs in the United States.  By so doing, Philips has committed the offense of attempted monopolization in violation of Section 2 of the Sherman Act.

147.    By means of the above-pled anticompetitive conduct, and with a specific intent to monopolize commerce, Philips has attempted to acquire a monopoly position in the market for the sale of central-station MPPMs in the United States.  By so doing, Philips has committed the offense of attempted monopolization in violation of Section 2 of the Sherman Act.

148.    By means of the above-pled anticompetitive conduct, and with a specific intent to monopolize commerce, Philips has attempted to acquire a monopoly position in the aftermarket for the sale of pulse-oximetry parameter systems that are run on Philips' MPPMs.  By so doing, Philips

has committed the offense of attempted monopolization in violation of Section 2 of the Sherman Act.

149.    In each of the above-pled markets, Philips has already acquired a monopoly position, or, if it has not yet done so, there exists a dangerous probability on present trends that it will do so, unless there is an antitrust intervention.

150.    Masimo has antitrust standing and has suffered losses in proximate consequence of the anticompetitive character of Philips' attempted monopolization in the above-pled markets (i.e., Masimo has suffered compensable antitrust injuries).  These losses remain ongoing, since Philips persists in the above-pled anticompetitive conduct.

**SIXTH CLAIM FOR RELIEF**
**Unlawful Restraints Of Trade In Violation Of Section 1 Of**
**The Sherman Act (15 U.S.C. § 1)**

151.    Masimo incorporates herein and realleges the allegations set forth in Paragraphs 1-150 of this Complaint.

152.    Philips has used its market power in the above markets and aftermarket to obtain parameter systems on conditions the supplier would not accept absent Philips' market power. Philips has unreasonably increased its rivals costs and substantially foreclosed and harmed competition in the above-pled markets and aftermarket.

153.    Philips has also entered into long-term exclusive agreements and service contracts that in practice require hospitals to purchase all or nearly all of their MPPM products, parameter systems, and related services only from Philips for long periods of time.  It has also placed biomedical representatives at hospitals that wield preponderant influence to cause hospitals to favor its products.  By so doing, Philips has unreasonably increased its rivals costs and substantially foreclosed and harmed competition in the above-pled markets and aftermarket.

154.    By using these trade restraints, Philips has intended to restrain commerce for its own benefit in the above markets and aftermarket, and it has succeeded at doing so, causing demonstrable harm to competition in the affected markets and aftermarket, as is fully pled above.

155.    On balance, Philips' above-pled practices have cumulatively undermined competitive processes in the affected markets and aftermarket more than they have furthered any legitimate, pro-competitive purpose.  If Philips had any legitimate, pro-competitive purpose for any of the above practices, it could have accomplished each such purpose by less restrictive methods that did not have the same anticompetitive effects on its core suppliers, direct competitors, and customers.

156.    By so acting, Philips has employed trade practices that constitute unlawful restraints of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

157.    Masimo has antitrust standing and has suffered losses in proximate consequence of the anticompetitive character of Philips' unlawful restraints of trade (i.e., Masimo has suffered compensable antitrust injuries).  These losses remain ongoing, since Philips persists in the above-pled anticompetitive conduct.

## **PRAYER FOR JUDGMENT AND RELIEF**

WHEREFORE, Masimo requests judgment as follows:

(1)    Pursuant to 35 U.S.C. § 271, a determination that Defendants and their officers, agents, servants, employees, attorneys and all others in active concert and/or participation with them have infringed Masimo's '727, '420 and '708 patents through the manufacture, use, offer for sale, and/or sale of infringing products and/or any of the other acts prohibited by 35 U.S.C. § 271;

(2)    Pursuant to 35 U.S.C. § 283, a determination that Defendants and their officers, agents, servants, employees, attorneys and all others in active concert and/or participation with

them should be enjoined from infringing Masimo's '727, '420 and '708 patents through the manufacture, use, offer for sale, and/or sale of infringing products and/or any of the other acts prohibited by 35 U.S.C. § 271, including permanent injunctive relief;

(3)     Pursuant to 35 U.S.C. § 284, a determination that Defendants should be required to compensate Masimo for infringement of Masimo's '727, '420 and '708 patents through payment of not less than a reasonable royalty on Defendants' sales of infringing products, and including Masimo's lost profits;

(4)     Pursuant to 35 U.S.C. § 284, an award increasing damages up to three times the amount found or assessed by the jury for Defendants' infringement of the '727, '420 and '708 patents in view of the willful and deliberate nature of the infringement;

(5)     Pursuant to 35 U.S.C. § 285, a finding that this is an exceptional case, and an award of reasonable attorney's fees and non-taxable costs;

(6)     An assessment of prejudgment and post-judgment interest and costs against Defendants, together with an award of such interest and costs, pursuant to 35 U.S.C. § 284;

(7)     A judgment that Defendants should be required to compensate Masimo for its injuries;

(8)     Monetary damages to compensate Masimo for its antitrust injuries, a trebling of these damages, and attorney's fees, as authorized under 15 U.S.C. § 15;

(9)     A declaration that Philips has violated the antitrust law;

(10)     Injunctive relief from each of Philips' anticompetitive commercial practices, as authorized under 15 U.S.C. § 26; and

(11)     That Masimo be granted such other and further relief as the Court deems equitable and just in the circumstances.

## JURY DEMAND

Masimo requests a jury trial for those issues so triable herein.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*

_____

Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
jtigan@mnat.com

*Attorneys for Plaintiff*

OF COUNSEL:

Joseph R. Re
Jon W. Gurka
Stephen W. Larson
KNOBBE, MARTENS OLSON & BEAR, LLP
2040 Main Street
Fourteenth Floor
Irvine, CA 92614

March 4, 2016